## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
### The Honorable Michael E. Romero

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 08-26950 MER |
| ROBERT LOUIS DIGESUALDO and | ) | |
| HAZEL MAE DIGESUALDO, | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |
| CHARLES F. MCVAY, | ) | Adversary No. 09-1232 MER |
| United States Trustee, Region 19, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT LOUIS DIGESUALDO and | ) | |
| HAZEL MAE DIGESUALDO. | ) | |
| | ) | Signed/Docketed |
| Defendants. | ) | June 30, 2011 |

### ORDER

THIS MATTER comes before the Court on the Complaint filed by Plaintiff Charles F. McVay, the United States Trustee (the "UST"), against Defendants Robert Louis and Hazel Mae DiGesualdo ("Mr. DiGesualdo" and "Mrs. DiGesualdo" individually, or the "DiGesualdos" or the "Debtors" collectively), seeking denial of discharge of the DiGesualdos' debts pursuant to 11 U.S.C. § 727(a)(2) and (a)(4)[1].

### JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(J), as the UST has objected to the Debtors' discharge.

---

[1] Unless otherwise noted, all future statutory references in the text are to Title 11 of the United States Code.

# BACKGROUND FACTS[2]

## **Background Related to Debtors' Business**

Debtors owned all the stock of, and were employed by, A-Mac Aluminum Products, Inc. ("A-Mac"), which was in the metal roofing and gutter business.[3]  They operated the business for about 22 years.[4]  Mr. DiGesualdo is 66 years old.  He has a twelfth-grade education, but also attended trade school.  He did the majority of the work on the business and, according to Mrs. DiGesualdo, is a "workaholic" who rarely missed work, even when sick.  Mrs. DiGesualdo also worked at A-Mac on a "very part-time" basis, doing some bookkeeping and then sending the records to an outside accountant.  Though Mrs. DiGesualdo's primary occupation was homemaking, she has also worked in elementary and high schools, has run a restaurant, and has delivered newspapers.  Mrs. DiGesualdo attended high school through the tenth grade.

Throughout most of the time the DiGesualdos owned A-Mac, it was a successful business; however, in the last few years business declined, and the DiGesualdos were unable to pay their creditors.  On May 15, 2008, the Debtors and A-Mac entered into an Asset Purchase Agreement with LeafGuard of Colorado, Inc. ("LeafGuard"), pursuant to which substantially all of A-Mac's assets were sold to that entity.[5]

In conjunction with the sale, each of the Debtors executed a non-competition agreement, under which they agreed not to compete against LeafGuard in the gutter installation business for a five-year period.[6]  In consideration for A-Mac's assets and the two non-competition agreements, LeafGuard paid a total of $302,994.70.  Under the Asset Purchase Agreement and the non-competition agreements, the amount paid by LeafGuard was allocated as follows: $100,000 for Mr. DiGesualdo's non-competition agreement, $100,000 for Mrs. DiGesualdo's non-competition agreement, and $102,994.70 for the assets of A-Mac.[7]  The Schedule of Payments attached as Exhibit "B" to the Asset Purchase Agreement provided $132,279.69 of the total amount paid by LeafGuard would be wired to the secured creditors of A-Mac at closing.

---

[2]  The background information is gleaned from the Stipulated and Uncontested Facts section of the Joint Pretrial Statement submitted by the parties and from testimony. The parties' Statement of Stipulated and Uncontested Facts is very comprehensive, and it is clear the parties put substantial work into it.  The Court commends the parties for their diligence and cooperation in this regard.

[3]  Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 6.

[4]  Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 7.

[5]  Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 8; Government Ex. 6.

[6]  Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 9.

[7]  Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 10.

One or both of the Debtors had guaranteed each of these secured debts.  The balance of $170,715.01 was to be paid into a certain "Personal Account - Bob & Hazel DiGesualdo."[8]

The Debtors' bank statements for their personal checking account at Guaranty Bank and Trust Company, Account Number ****01 (the "Personal Checking Account"), confirm $170,715.01 was transferred into such account by wire on May 15, 2008.  Following this transfer, on May 15, 2008, the Debtors' Personal Checking Account had a balance of $190,589.61.[9]

## Debtors' Pre-Petition Transfers

On April 4, 2008, the Debtors paid $20,000.00 to Ben Ledbetter by check no. 11910 drawn on the Debtors' Personal Checking Account and signed by Mr. DiGesualdo.[10] The $20,000 transfer to Ben Ledbetter was made for the benefit of Nick DiGesualdo, the Debtors' nephew.  The transfer was intended to repay a loan Nick DiGesualdo had made to the Debtors, by way of satisfying a debt owed by Nick DiGesualdo to Mr. Ledbetter.[11]

On May 21, 2008, the Debtors paid $25,000 to Lilian Melick, Mrs. DiGesualdo's sister, by check no. 11975 drawn on the Debtors' Personal Checking Account and signed by Mrs. DiGesualdo.  The transfer was made in repayment of a loan or loans previously received from Ms. Melick beginning in September 2004.[12]

On August 29, 2008, Mr. DiGesualdo purchased a 2006 Chrysler PT Cruiser from Go Chrysler Jeep.  On that date, the Debtors transferred $10,389.71 to Go Chrysler Jeep via checks drawn on the Debtors' Personal Checking Account and signed by Mrs. DiGesualdo.[13]

On September 3, 2008, the Debtors transferred $7,493 from their Personal Checking Account to Saxon Mortgage.  The Debtors' purpose in making this transfer was to prepay their home mortgage for five months, September 2008 through January 2009.[14]

---

[8] Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 11.

[9] Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 12.

[10] Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 13.

[11] Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 14.

[12] Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 15.

[13] Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 16.

[14] Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 17.

After May 15, 2008, the Debtors made the following transfers from their Personal Checking Account to A-Mac's checking account:  (i) check no. 11960 dated May 15, 2008, in the amount of $6,000; (ii) check no. 11965 dated May 19, 2008, in the amount of $31,000; (iii) check no. 6 dated May 28, 2008, in the amount of $36,000; (iv) check no. 5001 dated June 2, 2008, in the amount of $20,000; (v) check no. 5041 dated June 27, 2008, in the amount of $1,500; and (vi) check no. 5090 dated July 30, 2008, in the amount of $3,000.[15]  In addition, on June 27, 2008, Mrs. DiGesualdo signed check no. 5042 drawn on the Debtors' Personal Checking Account in the amount of $5,000 made out to "Cash."[16]  The Debtors testified the $5,000 in cash was located at their home on the Petition Date.[17]

**Debtors' Pre-Filing Activity and the Client Information Worksheet**

Mr. DiGesualdo testified the money from the A-Mac sale to LeafGuard was insufficient to pay off all of the Debtors' creditors.  Therefore, in the summer of 2008, Mr. DiGesualdo met twice with a bankruptcy attorney.[18]  When that attorney moved out of state, he referred Mr. DiGesualdo to attorney Cipriano Griego.  Mr. DiGesualdo subsequently met twice with Mr. Griego about filing for bankruptcy.[19]  At one of the meetings, Mr. Griego provided Mr. DiGesualdo with a Client Information Worksheet ("Worksheet") requesting information needed to prepare the Debtors' petition, schedules, and statement of financial affairs ("SoFA").[20]

Sometime after September 4, 2008, Mr. DiGesualdo filled out the Worksheet to the best of his ability.[21]  With respect to the Worksheet, the evidence reflects the following:

- Though Mr. DiGesualdo understood the term," he left the "cash on hand" section of the Worksheet blank.[22]

---

[15]  Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 18.

[16]  Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 44.

[17]  Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 45. The Debtors' testimony at the Rule 2004 Examination and the trial were consistent.  At trial, Mrs. DiGesualdo added that the $5,000 was in the Debtors' freezer on the Petition Date.

[18]  Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 19.

[19]  Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 20.

[20]  Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 21.  The Worksheet was admitted into evidence as Government Ex. 5.

[21]  Mrs. DiGesualdo did not participate in filling out the Worksheet.

[22]  *See* Government Ex. 5 at 2; Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 24.

- Though he understood what the "deposits of money" section of the Worksheet was asking, Mr. DiGesualdo left that section blank and did not identify the Debtors' personal checking account with Guaranty Bank.[23]

- Though he understood the term "payment," Mr. DiGesualdo did not understand the term "insider." Thus, on page 15 of the Worksheet, in the space below "3b. List all payments made to insider creditors (family) during the last year," Debtors wrote "NA." [24]

- On page 14 of the Worksheet, in the space below "1. Income from Employment or Operation of Business," the Debtors listed 2008 income of $6,500 from LeafGuard and $5,200 from A-Mac.[25]

- On that same page, in the space below "2. Income other than from employment or operation of business," the Debtors wrote "NA."[26]

- On page 17 of the Worksheet, in response to section 10 concerning other property transferred out of the ordinary course to a creditor or family member during the past year, the Debtors wrote, "None."[27]

Mr. DiGesualdo did indicate on the Worksheet he believed the Debtors owed $5,000 in federal income taxes and $1,500 in state income taxes payable in 2009 for the year 2008.[28]  He also indicated they had paid Mr. Griego $1,899 on September 4, 2008,[29] and had made a payment to Saxon Mortgage in the amount of $1,873.25 on the "15th."[30]  However, Mr. DiGesualdo did not mention the $7,493 pre-payment to Saxon Mortgage.[31]

---

[23]  *See* Government Ex. 5 at 2; Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 24.

[24]  *See* Government Ex. 5 at 17; Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 27.

[25]  Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 25.  *See also* Government Ex. 5 at 17

[26]  Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 26.  *See also* Government Ex. 5 at 17

[27]  Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 28.  *See also* Government Ex. 5 at 17.

[28]  *See* Government Ex. 5 at 7.

[29]  *See* Government Ex. 5 at  17.  When counsel for the UST pointed to the date indicated and asked Mr. DiGesualdo when he completed the Worksheet, Mr. DiGesualdo stated he must have completed it around September 4, 2008.

[30]  *See* Government Ex. 5 at  16.

[31]  The parties stipulate Debtors transferred these funds on September 3, 2008.  Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 17.

Mr. DiGesualdo had a number of questions about the Worksheet.  Both Debtors assert the provider of prepetition credit counseling declined to answer these questions.[32]  Therefore, Mr. DiGesualdo stated they left the Worksheet incomplete.  Subsequently, when Mr. DiGeusaldo returned the partially-completed Worksheet to Mr. Griego's office, he told Mr. Griego's assistant he had questions and would like to discuss them with Mr. Griego.[33]

Mr. DiGesualdo never discussed his questions with Mr. Griego.  Instead, Mr. Griego's assistant used the data from the Worksheet to create the original bankruptcy Petition, SoFA, and Schedules filed in this case.[34]  No one from Mr. Griego's office mailed copies of the original Petition, Schedules, or SoFA to the Debtors.[35]  The Debtors were not given an opportunity to review these documents, nor to sign the Petition, Schedules, and SoFA prior to their being filed by Mr. Griego's assistant.[36]  Indeed, the DiGesualdos did not speak to anyone from Mr. Griego's office until the § 341 meeting, which was held on December 5, 2008.[37]

Mr. DiGesualdo noted he did not list the income from the sale of A-Mac to Leafguard on the Worksheet because he did not consider the money to be "income."  Instead, he considered the money to be money "to pay the bills."  He said, "I haven't for 66 years done anything dishonest . . . . Why would I dishonor myself this way?"[38]

When asked why he did not list the payments to Ms. Melick and Mr. Ledbetter on the Worksheet, Mr. DiGesualdo explained he understood the Worksheet to relate to his personal bankruptcy and not to matters related to the proceeds from the business.  According to Mr. DiGesualdo, Mr. Griego never really talked to him about the business.  Further, Mr. Griego advised him the business "would just fade away" with the bankruptcy.[39]  Therefore, in considering the questions on the Worksheet, Mr. DiGesualdo was thinking more in terms of paying debts he felt he had personally incurred, as opposed to debts he considered business debts.  According to Mr. DiGesualdo, Nick DiGesualdo had loaned him money for his business when he suffered a heart attack and could not work.  Mr. DiGesualdo got the money to repay

---

[32]  Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 23.

[33]  On the Worksheet he gave to Mr. Griego's assistant, Mr. DiGesualdo included a note to Mr. Griego asking him to add another creditor to the list.  The note did not indicate he had questions to discuss.  Government Ex. 5 at 26.  Mr. DiGesualdo said he did not know why he would need to make a written request to discuss his questions.

[34]  Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 29.

[35]  Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 30.

[36]  See Joint Pretrial Statement., Stipulated and Uncontested Facts ¶ 31.

[37]  See Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 35.

[38]  April 7, 2011 Audio File at 10:37 a.m.

[39]  April 7, 2011 Audio File at 10:56 a.m.

Nick DiGesualdo, through Mr. Ledbetter, from his IRA, before he even contemplated bankruptcy.  Mr. DiGesualdo stated if he had received "good advice from a lawyer that was competent," he would not be in court today.

When asked about the $7,493 payment to Saxon Mortgage, Mr. DiGesualdo testified he had made the payment because he asked Mr. Griego, "Could I make my house payments?  He said 'yes,' so I made my house payments."[40]  He said he tried to follow his counsel's advice. Although inconsistent with the dates on the documents, Mr. DiGesualdo testified he did not think he had made the Saxon Mortgage payment before filling out the Worksheet.

**The Trustee Information Sheet and § 341 Meeting**

According to the Debtors, on the day of the § 341 meeting, Mr. Griego arrived late, and Mr. Griego gave them a Trustee Information Sheet,[41] telling them to sign the document because there was no time to review it before they went into the § 341 meeting.  The following statement appears above the signature line on the Trustee Information Sheet:  "The Debtor(s) herein declare under penalty of perjury that the answer to the foregoing questions and statements contained herein are true, complete and correct to the best of the Debtor's (s') knowledge and information."[42]  According to Mr. DiGesualdo, he did not fill out the Trustee Information Sheet, nor did he read it before signing it.  Further, he did not know who completed the document.

---

[40] April 7, 2011 Audio File at 10:31 a.m.

[41] *See* Government Ex. 7.  Dan Hepner, the Chapter 7 Trustee, testified that a Trustee Information Sheet is a document debtors are asked to complete prior to being examined at their meeting of creditors.  It is designed to summarize assets available to the Trustee for administration, as well as to list transfers shown on the bankruptcy schedules.  It provides the Trustee with an overview of the debtors' financial situation on the petition date, as well as a method to cross-check the information set forth on the schedules and statements which  are filed with the Court.  It is intended to furnish the Trustee with additional information accessible during the course of the § 341 examination to ensure nothing is overlooked.

[42] Government Ex. 7 at 2.

Mr. Griego did not review the document with the Debtors.[43]  Though he sat for approximately 15 minutes before being called for the hearing, Mr. DiGesualdo did not ask to review the document he had just signed.  He explained he and Mrs. DiGesualdo had never been through the bankruptcy process and were nervous about what was to happen.  He further testified Mr. Griego advised them to answer the questions at the § 341 meeting with "yes" or "no,"[44] and to let him do most of the talking.  Mrs. DiGesualdo echoed her husband's testimony, stating she did not read the Trustee Information Sheet before signing it, and signed it because Mr. Griego told her to do so.  Mrs. DiGesualdo testified she trusted Mr. Griego.

The pertinent portions of the Trustee Information Sheet read:

- The line next to question 1, "Cash on Hand," states "-0-."[45]

- The line next to "Undeposited Checks" was left blank.[46]

- Under question 2,  "Bank Account Balances," it states, "Guarantee Bank & Trust," and next to that, "$1500 (Soc Sec Checks)."[47]

- Question 12, "Did the Debtor(s) pay any unsecured creditor more than $600 within 90 days immediately preceding the Case filing:" indicates, "Bellco - Saxon Mortgage."

- Question 13, "Did Debtor(s) pay, give money, or transfer any real or personal property of any kind to or for the benefit of any friend or family member within two years immediately preceding the case filing:" indicates "no."

---

[43]  Mr. Griego's testimony at the August 4, 2010 hearing on the Debtors' Request for Order to Show Cause and Cipriano Griego's response thereto conflicts with the Debtors' testimony that he did not go over the Trustee Information Sheet with them.  However, the Court believes Mr. Griego arrived at the § 341 meeting late, as he testified he had driven from Denver to Fort Collins for the meeting, and therefore, prepared for the meeting in haste.  Further, although the Court believes the bulk of the information on the Trustee Information Sheet came from the Worksheet or from initial client meetings, the Court does not believe all of the information on the Trustee Information Sheet could have come from these sources alone.  In contrast to the Debtors' testimony, it seems likely Mr. Griego asked a few questions and filled out the sheet just prior to the 341 meeting.  However, given Mr. Griego's haphazard work in this case, the Court finds credible the Debtors' testimony that Mr. Griego did not go through the Trustee Information Sheet with them before they signed it.  The Court also believes the Debtors did not really have a chance to look over the sheet while they waited for their turn at the § 341 meeting.  The Debtors' testimony that they were nervous and listening to other creditors' meetings and thus did not review the sheet is entirely plausible, and their reliance on counsel to make sure the sheet was properly completed is not unreasonable.

[44]   April 7, 2011 Audio File at 11:15 a.m.

[45]  Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 48; Government Ex. 7 at 1.

[46]  Government Ex. 7 at 1.

[47]  Government Ex. 7 at 1.

- Next to question 14, "List the make, model, mileage and general condition of all motor vehicles which the Debtor(s) own or lease," appear the words "2006 PT Cruiser - Doge [sic]."  Below that, in response to "When did you by car/vehicle #1?," is stated, "Oct, 2008."[48]

In regard to specific entries on the Trustee Information Sheet, Mr. DiGesualdo testified he did not know why Mr. Griego knew to identify a bank account with Guaranty Bank and Trust, unless it was because he had written Mr. Griego a check from that account.  Further, Mr. DiGesualdo did not know why Mr. Griego indicated on the Trustee Information Sheet there was a $1,500 balance on the Guaranty Bank account.  He stated Mr. Griego had been able to identify their ownership of the PT Cruiser on the Trustee Information Sheet because he had told Mr. Griego about their purchase of the car.  Mr. DiGesualdo also told Mr. Griego in their first meeting he had American Family Insurance, as stated on the sheet.

The parties agree the Debtors first saw the original Petition, Schedules, and SoFA at the § 341 meeting,[49] despite the fact they were filed by Mr. Griego's assistant on October 27, 2008.[50]  In regard to the SoFA and Schedules, the parties have stipulated:

- The original SoFA, Question 1 (income from employment or operation of business) lists 2008 year-to-date income from employment of $9,535.00 and no other income for 2008.  Question 2 of that document (income other than from employment or operation of business) only listed 2008 year-to-date Joint Social Security Income of $18,980.00.[51]

- The original SoFA, Question 3a (payments made within 90 days prior to the bankruptcy filing) only listed the following transfers:  1) payments of $1,116.00 made to Bellco Credit Union on September 15, 2008, and August 15, 2008, and 2) payments of $1,873.25 made to Saxon Mortgage on the "15th day of each month."[32]

- The original SoFA, Question 3c (payments made within one year prior to the bankruptcy filing to creditors who are or were insiders) was checked "None."[31]

---

[48] Government Ex. 7 at 2.

[49] *See* Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 31.

[50] *See* Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 32.

[51] *See* Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 33.

[32] *See* Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 34.

[31] *See* Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 35.

•    The original SoFA, Question 10 (other transfers within two years prior to the filing) was checked "None."[32]

•    The original Schedule B did not disclose any interest of the Debtors in cash.  Item 1 of Schedule B ("Cash on hand") was checked "None."[33]

Dan Hepner, Chapter 7 Trustee, testified he prepared for the § 341 meeting by reviewing the Schedules and SoFA filed in the Debtors' case, along with their tax return.  He also stated he had been contacted by a third party[34] about the DiGesualdo case, which prompted him to look at the public records to find out whether Mr. DiGesualdo had interests in other businesses, about his interest in A-Mac Aluminum, and whether there were transfers of real property within the four-year period prior to the bankruptcy filing.  He also looked at the Colorado Secretary of State records and did some asset searches of public records.

According to Mr. Hepner, if the Trustee Information Sheet had listed "$5,000" in the "cash on hand" section, he would have asked about the source of the money, inquired as to the location of the funds, and would have tried to determine what portions of the funds were exempt and non-exempt.  Then he would have sought turnover of the non-exempt portions.  Mr. Hepner stated if question 13 (regarding transfers to family members) had been answered in the affirmative, he would have asked about the transfer, when the debt was incurred and whether it was in payment of a debt owed by the Debtors to the transferee.  If the transfer had been made in payment of a debt, he would have asked what the terms of repayment were, when the repayment was made, and what the purpose of the debt was.  He would also have asked for the name and address of the lender, and asked questions regarding the financial situation of the lender so he could make a decision whether to initiate a recovery action.

After Mr. Hepner learned the Debtors had made transfers to relatives in this case – specifically, to Ms. Melick and to Mr. Ledbetter for the benefit of Nick DiGesualdo – he initiated avoidance actions against Ms. Melick and Nick DiGesualdo.  He settled both cases and recovered portions of the sums transferred for the estate.[35]

---

[32] *See* Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 36.

[33] Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 46.

[34] This individual was not specifically identified in Mr. Hepner's testimony.

[35] On October 13, 2010, the Trustee commenced Adv. No. 10-1751 MER against Lilian Melick seeking avoidance under 11 U.S.C. §§ 547 and 550 of the Debtors' prepetition transfer of $25,000 to Ms. Melick.  On January 31, 2011, the Court approved a settlement between the Trustee and Ms. Melick whereby Ms. Melick agreed to pay $17,000 to the estate.  Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 57.  On October 13, 2010, the Trustee commenced Adv. No. 10-1752 MER against Nick DiGesualdo seeking avoidance under §§ 547 and 550 of the Debtors' prepetition transfer of $20,000 for the benefit of Nick DiGesualdo.  On March 11, 2011, the Trustee filed a motion to approve a settlement by which Nick DiGesualdo has agreed to pay $13,000 to the estate.  Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 58.

At the § 341 meeting, Mr. Hepner asked Mr. DiGesualdo about his current employment, and then about his employment with A-Mac.  Through this line of questioning he learned the Debtors had sold A-Mac.  He also learned the Debtors had received about $300,000 from the sale of the business, which Mr. DiGesualdo stated he had used to "[pay] off creditors, materials, everybody I owed money to."[36]  Approximately $20,000 to $25,000 remained[37] and was deposited into Guaranty Bank.[38]  On further questioning, when Mr. Hepner asked what the Debtors had done with the money, Mr. DiGesualdo stated, "Paid our house payment up until January, bought a car, and that was it.  Lived off the rest of it.  Not much left."[39]  At no time during the § 341 meeting did the Debtors state they had $5,000 in their possession.

Mr. Hepner noted the Debtors' § 341 meeting was not typical and the questioning more extensive, because he had been contacted ahead of time and had issues brought to his attention. Mr. Hepner also thought Mr. DiGesualdo became nervous and agitated as the questioning proceeded.

At no time during the § 341 meeting did the Debtors inform Mr. Hepner of the transfers to Ms. Melick or Mr. Ledbetter, nor did they indicate they had unanswered questions about the information they were to provide in the case.  They also did not tell Mr. Hepner they had not read the Trustee Information Sheet.  In addition, when Mr. Hepner asked, "Did you sign the Petition, Schedules, and Statements filed with the Court in your case?," both Mr. and Mrs. DiGesualdo answered, "Yes."[40]  When Mr. Hepner asked, "Other than what we've discussed today, is the information in them true and correct to the best of your knowledge, information, and belief?," Mrs. DiGesualdo answered, "Yes."[39]  Both Debtors also testified they had previously identified  all the assets they owned.[40]

---

[36]  Government Ex. 3 at 4:20-21.

[37]  Government Ex. 3 at 4:22-25.

[38]  Government Ex. 3 at 5:1-2.

[39]  Government Ex. 3 at 5:3-6.

[40]  Government Ex. 3 at 27:10-17.

[39]  Government Ex. 3 at 27:18-21.

[40]  Government Ex. 3 at 28:17-19.

**The Debtors' Pre-Trial Testimony**

Subsequent to their § 341 meeting of creditors, the Debtors were examined on two other occasions.[41]  Prior to the 2004 Examination, the DiGesualdos provided their bank account statements to the UST.  At the 2004 Examination, counsel for the UST asked Mr. DiGesualdo about a June 27, 2008 check made out to "cash" in the amount of $5,000 and if he remembered the purpose of that check.  Mr. DiGesualdo stated, "Yeah, that's to save for our taxes."[42]  He further stated the money had been in the Debtors' possession at the time they filed for bankruptcy.[43]  Mr. DiGesualdo also noted the Debtors still had the money at the their house.[44]

When asked why the Debtors did not disclose the $5,000, Mr. DiGesualdo answered, "Everybody says I could keep money out to pay my taxes . . . ."[45]  As to why the Debtors did not leave the $5,000.00 in their checking account, Mr. DiGesualdo testified that everybody he talked to said the Debtors "couldn't have money in [their] checking account" when they filed for bankruptcy.[46]  When counsel for the UST asked, "What would happen if you had money in your checking account?" Mr. DiGesualdo responded, "I guess you would attach it, I don't know.  I've never done this before so I'm not – I'm not trying to do anything wrong."[47]

During the 2004 Examination, Mr. Hepner (who was also present) stated, "Well, I understand that you have the $5,000 that you need – set aside for your taxes.  But that was cash on hand that you had on the date of the filing of the Petition.  So, Mr. Griego, we're going to need to make arrangements to get the $5,000 to me."  Mr. DiGesualdo then asked, "Well how . . . . Who's going to pay our taxes?"[48]  At trial, Mr. Hepner pointed out had he not requested the Debtors' bank statements, and had he and the UST's counsel not asked specifically about

---

[41] On April 7, 2009, the Debtors appeared at the offices of the UST and testified under oath at an examination pursuant to FED. R. CIV. P. 2004 (the "2004 Examination") (Government Exhibit 13 is the transcript of the 2004 Examination).  Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 40.  They also appeared on October 20, 2009, at the offices of the UST and testified under oath at a deposition (the "Deposition") (Government Exhibit 14 is the transcript of the Deposition.).  *See* Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 42 and Government Ex. 14.  The pertinent information discussed herein comes from the 2004 Examination.

[42] Government Ex. 13 at 47:21-48:10.

[43] Government Ex. 13 at 48:11-18.

[44] Government Ex. 13 at 48:19-20.

[45] Government Ex. 13, at 66: 12-13.

[46] Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 49; Government Ex. 13 at 92:1-4.

[47] Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 49; Gov Ex. 13 at 92:5-9.

[48] Government Ex. 13 at 88:23-89:5.

particular transactions, he would not have discovered the Debtors were in possession of $5,000 in cash.

Following the 2004 Examination, and by April 15, 2009, the Debtors deposited all or most of the $5,000 into their personal checking account.  From those funds, the Debtors paid $4,000 to the IRS in connection with an Application for Automatic Extension of Time to File U.S. Individual Tax Return, and paid $1,000 to the Colorado Department of Revenue in connection with an automatic extension of their state tax return.[49]  When completed, the Debtors' 2008 Individual Income Tax Return showed the Debtors had no federal tax liability for 2008. Their total payments amounted to $4,193, including the $4,000 paid in connection with the extension.  On the tax return, the Debtors elected to have the $4,193 applied to their 2009 estimated tax rather than receive a refund (as had been their past practice).[50]  Similarly, when completed, the Debtors' Colorado Individual Income Tax Return for 2008 showed they owed state income tax of $350.  Their total payments amounted to $1,083, including the $1,000 paid in connection with the extension, resulting in an overpayment of $733.  Again, the Debtors elected to have the $733 applied to their 2009 estimated tax.[51]

Mr. DiGesualdo explained at trial that it was important to the Debtors to pay their taxes in full.  He also stated Mr. Griego had advised the Debtors they could pay their 2008 taxes.  Mr. DiGuesaldo further noted "somebody" advised them to get estimated tax payment information. They got such an estimate, then withdrew $5,000 from their personal checking account via check no. 5042, made out to "Cash," setting aside $5,000 to be applied to 2008 tax liability.[52]  Mr. DiGesualdo indicated he did not know how to pay estimated taxes, and had gotten no advice on that subject.  However Mr. Griego did not advise him to withdraw the cash from his account, nor did he specifically advise him whether to disclose the cash. Moreover, Mr. DiGesualdo stated no one had advised him to pay the $5,000 to the IRS or to the bankruptcy estate.  Generally, Mr. DiGesualdo received no advice as to whether transactions should or should not be disclosed. Mr. DiGesualdo understood the Debtors would be liable for 2008 taxes notwithstanding their receipt of a discharge in bankruptcy.[53]

---

[49] Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 51.

[50] Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 52.

[51] Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 53.

[52] This is consistent with the Debtors' testimony at the 2004 Examination, where they stated they set aside the $5,000 to be applied toward 2008 tax liability.  *See* Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 45.

[53] Mr. Griego ceased representing the DiGesualdos after the 2004 Examination. Therefore, the Debtors were not represented when they made the tax payments to the State and IRS; rather, they were seeking new counsel at the time.

**Adversary Proceeding and Debtors' Actions Thereafter**

On April 21, 2009, the UST filed his Complaint commencing this adversary proceeding.[54] On June 13, 2009, the Debtors, now represented by Sonja Becker, filed an Amended Petition, Amended Schedules, and Amended SoFA.  Among other things, the Amended SoFA discussed the sale of A-Mac and listed the transfers to Saxon Mortgage, to Go Chrysler Jeep, to Lillian Melick, and for the benefit of Nick DiGesualdo.  The Amended Schedule B listed the $5,000 of "cash on hand."[55]  The Amended Schedule F listed creditors holding $670,145.00 in unsecured, nonpriority claims.[56]

On April 14, 2010, the Debtors turned $5,000 over to the Trustee.[57]  According to Mr. DiGesualdo, the Debtors did not pay the $5,000 to Mr. Hepner earlier because they did not have the money, but said as soon as possible after Ms. Becker informed the Debtors it needed to be paid, Mr DiGesualdo borrowed money from his daughter and withdrew funds from his IRA to make the payment.

Mr. DiGesualdo asserted he was not trying to be dishonest about the $5,000, and had no intention to defraud anyone or to keep anything from anybody.  He noted he had been honest at the 2004 Examination about holding onto the money to pay taxes, and stated he could have said the Debtors had used the money for expenses rather than being honest about still having the $5,000 on hand.

## DISCUSSION

"[B]ankruptcy is a serious matter and when one chooses to avail himself of the benefits of Chapter 7 relief he assumes certain responsibilities, the foremost being to fully disclose his assets and to cooperate fully with the trustee."[58]  Indeed, because a debtor's full disclosure and cooperation are necessary for the functioning of our bankruptcy system, "those who seek shelter of the bankruptcy code must provide complete, truthful and reliable information."[59]

---

[54] Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 54.

[55] Government Ex. 2.

[56] Bankr. Case No. 08-26950 (Docket #37), Schedule F.

[57] Joint Pretrial Statement, Stipulated and Uncontested Facts ¶ 56.

[58] *United States Trustee v. Garland (In re Garland)*, 417 B.R. 805, 814-15 (10th Cir. BAP 2009) (internal quotation omitted).

[59] *Job v. Calder (In re Calder)*, 907 F.2d 953, 956 (10th Cir. 1990) (internal quotation omitted).

Section 727 provides:

(a) The court shall grant the debtor a discharge, unless –

. . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

      (A) property of the debtor, within one year before the date of the filing of the petition;  or

      (B) property of the estate, after the date of the filing of the petition;

. . .

(4) the debtor knowingly and fraudulently, in or in connection with the case—

      (A) made a false oath or account;

      (B) presented or used a false claim;

      (C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or

      (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs . . . .[60]

Exceptions to discharge are to be construed liberally in favor of the debtor, because a total bar to discharge is an extreme penalty.[61]  Indeed, denial of discharge should occur only in extreme circumstances.[62]

---

[60] 11 U.S.C. § 727(a)(2)(A) and (B) and (a)(4).

[61] *Rosen v. Bezner*, 996 F.2d 1527, 1534 (3rd Cir. 1993); *Martinez v. Los Alamos Nat'l Bank (In re Martinez)*, 126 Fed. Appx. 890, 897 (10th Cir. 2005) (unpublished decision).  *Freelife Int'l, LLC v. Butler (In re Butler)*, 377 B.R. 895, 915 (Bankr. D. Utah 2006).

[62] *Melarango v. Ciotti (In re Ciotti)*, 448 B.R. 694, 702, (Bankr. W.D. Pa. 2011).

1.      **Section 727(a)(2)(A) and (B) Claims (First and Second Causes of Action)**

A party objecting to discharge under § 727(a)(2)(A) must prove by a preponderance of the evidence:  (1) the debtor transferred, removed, concealed, destroyed, or mutilated (2) property of the estate, (3) within one year prior to the bankruptcy filing, (4) with the intent to hinder, delay, or defraud a creditor [or an officer of the estate charged with custody of property of the estate].[63]  Similarly, to prevail under § 727(a)(2)(B), a party must prove by a preponderance of the evidence:  "(1) the debtor transferred, removed, destroyed, mutilated or concealed property; (2) belonging to the estate; (3) post-petition; (4) intending to hinder, delay or defraud a creditor [or officer] of the estate."[64]  Under § 727(a)(2), "[d]enial of discharge need not rest on a finding of intent to *defraud*.  Intent to hinder or delay is sufficient."[65]

In his first cause of action, the UST seeks denial of the Debtors' discharge, arguing the $5,000 in cash withdrawn on June 27, 2008, was property of the estate, which the Debtors transferred, removed, and/or concealed within one year prior to the bankruptcy filing.  The UST further argues Debtors took such action with the intent to hinder, delay, or defraud an officer of the estate.  In his second cause of action under § 727(a)(2)(B) the UST alleges the $5,000 in cash constituted property of the estate which Debtors transferred, removed, or concealed post-petition, and the Debtors took such action with intent to hinder, delay, or defraud an officer of the estate.

"Fraudulent intent may be established by circumstantial evidence, or by inferences drawn from a course of conduct."[66]  Further, a number of circumstances may evidence actual intent to defraud under § 727(a)(2)(A), including:

> 1) the lack or inadequacy of consideration; 2) the family, friendship or close associate relationship between the parties; 3) the retention of possession, benefit or use of the property in question; 4) the financial condition of the party sought to be charged both before and after the transaction in question; 5) the existence of a pattern or series of transactions after the onset of financial difficulties, or pendency or threat

---

[63]  *OTE Canada v. Warren (In re Warren)*, 512 F.3d 1241, 1249 (10th Cir. 2008) (quoting *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1293 (10th Cir. 1997)) (brackets added to conform to § 727(a)).

[64]  *United States Trustee v. Vigil (In re Vigil)*, 414 B.R. 743, 746 (citing *Butler*, 377 B.R. at 915, in which the court stated that the elements of § 727(a)(2)(A) and (a)(2)(B) are "substantially the same . . . except that the plaintiff must prove that the debtor transferred or concealed property of the estate after the bankruptcy petition was filed") (brackets added).

[65]  *Butler*, 377 B.R. at 915 (quoting *Bernard v. Sheaffer (In re Bernard)* 96 F.3d 1279, 1281 (9th Cir. 1996) (emphasis in original)).

[66]  *Farmers Coop. Ass'n of Talmage, Kan. v. Strunk*, 671 F.2d 391, 395 (10th Cir. 1982); *see also Aweida v. Cooper (In re Cooper)*, 150 B.R. 462, 465 (D. Colo. 1993).

of suits by creditors; and 6) the general chronology of the events and transactions under inquiry.[67]

There is no dispute that on June 27, 2008, within one year prior to their bankruptcy filing, the Debtors withdrew $5,000 in cash from their Personal Checking Account, nor that they had possession of the cash at the time they filed for bankruptcy and, indeed, for some time thereafter. It is clear from the testimony that the Debtors made this withdrawal with the intention of holding the funds to pay their 2008 taxes. Having listened carefully to the testimony, the Court believes the DiGesualdos did so based upon an honest misunderstanding. Although Mr. Griego did not advise the Debtors specifically to withdraw cash and set it aside to pay their taxes, he did advise Mr. DiGesualdo he could pay his taxes.

In what appears to be an unfortunate pattern in this case, Mr. Griego did not ask his clients appropriate questions such as how they intended to pay their taxes, nor did he take the time to explain that Mr. DiGesualdo should pay his estimated taxes before filing. The Court finds Mr. DiGesualdo acted in a manner he believed comported with the advice he received from counsel pre-petition – not with an intent to hinder, delay, or defraud an officer of the estate.[68] Further, the Court believes the Debtors' failure to disclose the $5,000 cash was not due to any intention to conceal assets from an officer of the estate, but rather was attributable to Mr. Griego's failure to go through the Worksheet, Petition, Schedules, and SoFA with the Debtors and to explain to them the scope of their disclosure obligations. Indeed, as Mr. DiGesualdo noted, had the DiGesualdos intended to conceal the asset, they could have testified they used the $5,000 for living expenses rather than forthrightly acknowledging they still had the money in their possession. Accordingly, the Court finds there is no basis for denial of discharge under § 727(a)(2)(A).

There is also no dispute that, post-petition, after the 2004 Examination, the Debtors deposited the $5,000 into their checking account, nor that these funds were then applied toward the Debtors' tax liability. In addition, the transcript from the 2004 Examination shows Mr. Hepner advised the Debtors the $5,000 would need to be turned over to him. Further, Mr. Hepner's testimony that he directed his comment toward both Mr. Griego and Mr. DiGesualdo, and Mr. DiGesualdo responded, "Well how . . . . Who's going to pay our taxes?"[69] demonstrates

---

[67] *Cooper*, 150 B.R. at 465 (citation omitted). This list is not exhaustive. *Id.* at n.1.

[68] The Court is troubled by Mr. DiGesualdo's testimony at the 2004 Examination that he did not keep the $5,000 in the Debtors' personal account because he knew any money in the account would be subject to attachment. However, the Court believes the Debtors withdrew the funds with the understanding it was lawful for them to pay their taxes with the funds post-petition, based on their conversation with Mr. Griego. The Court also believes had the DiGesualdos possessed a fraudulent intent or intent to conceal the funds, they would not have acknowledged they still possessed the funds at the time of the 2004 Examination. Indeed, it would have been very difficult for the UST or the Chapter 7 Trustee to establish the DiGesualdos had withheld the funds had the DiGesualdos not been honest during the 2004 Examination.

[69] Government Ex. 13 at 88:23-89:5.

Mr. DiGesualdo, at least, understood the money was subject to turnover.  Therefore, the Court does not find credible Mr. DiGesualdo's testimony he did not know he needed to turn the money over until he was so informed by Ms. Becker.[70]  The Debtors' transfers of the money in light of such knowledge constitute a basis for denial of discharge under § 727(a)(2)(B).

## 2.      Section 727(a)(2)(A) Claim (Third Cause of Action)

The UST contends the Debtors' failure to disclose the transfer of substantially all of the funds in their personal checking account, which held $190,580.61 as of May 15, 2008, was knowing and fraudulent.  The undisclosed transfers include:  $97,500 to A-Mac, $25,000 to Ms. Melick, $10,389.71 to Go Chrysler Jeep, $7,493 to Saxon Mortgage as prepayment on their mortgage, and $5,000 from the Debtors' checking account to be held by the Debtors in cash.

### a.      Transfers to A-Mac and Ms. Melick

The Court finds credible Mr. DiGesualdo's testimony that the Debtors did not view the funds received from sale of their business to be personal funds and believed they were paying business debts with business funds.  Though this understanding was in error, the Court does not believe a reasonable person with the Debtors' education levels would necessarily have understood the funds received in exchange for the Debtors' non-competition agreements were personal funds.[71]  Accordingly, the Court does not find the Debtors' failure to disclose the transfers of $97,500 to A-Mac and $25,000 to Ms. Melick was knowing and fraudulent.

### b.      Transfers to Go Chrysler Jeep

The Court also does not find the Debtors fraudulently concealed their payment for the PT Cruiser to Go Chrysler Jeep.  Though the transfer of funds itself was not disclosed, the purchase of a vehicle in October 2008 is revealed on the Trustee Information Sheet in response to question 12.[72]  Further, Mr. DiGesualdo testified at the § 341 meeting he had bought a car with the money realized from the Leafguard transaction.  Since the transfer was adequately disclosed at the § 341 meeting, the objection under § 727(a)(2)(A) regarding transfers to Go Chrysler Jeep is not sustained.

---

[70]  Mr. DiGesualdo's fear of not paying his taxes appears to have blinded him to the potential consequences of withholding funds from the Chapter 7 Trustee.  However, when the potential consequences of failing to turn over the funds were actually explained to Mr. DiGesualdo by new counsel, he borrowed money from his daughter and withdrew funds from his IRA in order to make sure the Trustee received the funds due to the estate.  While the turnover came quite late (indeed, it did not occur until after this adversary proceeding was filed) the Court finds the DiGesualdos' eventual turnover of the funds mitigates, to some extent, the harm caused by their failure to disclose the cash earlier.

[71]  This is another instance where Debtors' counsel failed to provide them with appropriate advice.

[72]  Government Ex. 7 at 2.

      c.      <u>Transfers to Saxon Mortgage and Cash Withdrawal</u>

The Court also finds the Debtors' failure to disclose the $7,493 prepayment to Saxon mortgage and the $5,000 cash likely would have been avoided had Mr. Griego done his job properly. The Court concludes the nondisclosure of these transfers does not evidence an intent to hinder, delay, or defraud, and therefore this does not provide a basis for denial of discharge under § 727(a)(2)(A).

**3.      Section 727(a)(4)(A) Claims (Fourteenth and Sixteenth Causes of Action)**

In his fourteenth claim, the UST seeks denial of discharge on the ground that the Debtors made a false oath by knowingly and fraudulently failing to disclose the $5,000 on the Trustee Information Sheet. In his sixteenth claim, the Trustee contends discharge should be denied because the Debtors' testimony in affirming their Schedules and SoFA listed all their assets was a false oath and because such oath was made knowingly and fraudulently.

Section 727(a)(4)(A) "is designed to ensure that the debtor provides honest and reliable information to the trustee and others interested in the administration of the estate without their having to conduct costly investigations to discover the debtor's true financial condition."[73] In order to prevail under § 727(a)(4)(A), the UST must show by a preponderance of the evidence: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case.[74]

"Fraudulent intent may be deduced from the facts and circumstances of a case."[75] "Fraudulent intent can also be demonstrated by showing that the debtor acted with 'reckless disregard,' or 'the state of mind present when a debtor does not care about the truth or falsity of a statement,' which is the equivalent of knowing that the representation is false and material."[76] However, "[a]n honest mistake or oversight is not sufficient to deny a debtor his discharge."[77] "Even a false statement resulting from ignorance or carelessness does not rise to the level of 'knowing and fraudulent' sufficient to deny a discharge."[78] "The subject matter of a false oath is

---

[73] *Ciotti*, 2011 WL 1466936 at *6 (Bankr. W.D. Pa. Apr. 18, 2011)(quoting *In re Singh*, 433 B.R. 139, 154 (Bankr. E.D. Pa. 2010)).

[74] *McVay v. Phouminh (In re Phouminh)*, 339 B.R. 231, 242 (Bankr. D. Colo. 2005).

[75] *Garland*, 417 B.R. at 815.

[76] *United States Trustee v. Mosher (In re Mosher)*, 417 B.R. 772, 784 (Bankr. N.D. Ill. 2009) (quotations omitted).

[77] *Ciotti*, 448 B.R. at 704 (quoting *Singh*, 433 B.R. at 154).

[78] *Id.* at *6 (citing *In re Oliver*, 414 B.R. 361, 374 (Bankr. E.D. Tenn. 2009)).

'material,' and thus sufficient to bar discharge if it bears a relationship to the bankrupt's business transactions or estate, or concerns the disposition of assets, business dealings, or the existence and disposition of his property."[79]

A debtor's statements at a § 341 meeting, and testimony given at a 2004 Examination, constitute statements under oath for purposes of § 727(a)(4).[80]  Further, since the Trustee Information Sheet stated, above the signature line, that the Debtors declared "under penalty of perjury" the answers to the questions therein were true, complete and correct to the best of the Debtors' knowledge and information, the Trustee Information Sheet also constitutes a statement under oath for purposes of § 727(a)(4).

The Court believes Mr. Griego rushed through the Trustee Information Sheet with minimal assistance from the Debtors; therefore, the Court cannot conclude the answers on the Trustee Information Sheet were truly the Debtors' statements.  Accordingly, the Court finds any omissions on the sheet are not a basis for denial of discharge under § 727.

The Debtors' testimony at the § 341 hearing presents a more difficult issue.  Specifically, the Debtors's testimony that they signed the Petition, Schedules, and Statements filed with the Court in their case was clearly false, as was their testimony that what was in those documents was true to the best of their knowledge, information and belief.  Further, the Debtors' testimony they had listed all their assets was also false.  To a certain extent, the blame for this inaccuracy can be placed at Mr. Griego's feet, for it was he who advised the Debtors to answer "yes" to those questions.  However, it is hard to believe the Debtors did not know their testimony was false, or, notwithstanding advice from counsel, they did not understand they had an obligation to tell the truth during the meeting – particularly since they were duly sworn at the beginning of the proceeding.[81]  Such failure to be candid cannot be sanctioned, for the functioning of the bankruptcy system depends upon the honesty of debtors at all stages of the bankruptcy process. The Debtors' false statement under oath thus constitutes a basis for denial of discharge under § 727(a)(4)(A).

### 4.    Court's Discretion Under § 727(a)

In cases such as this, where grounds for denying discharge are present, the language of § 727(a) nonetheless vests bankruptcy courts with the discretion to grant a discharge.[82]  When

---

[79]   *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984); *Calder*, 907 F.2d at 955 (quoting *Chalik*).

[80]   *Butler*, 377 B.R. at 922 (citations omitted).

[81]   Government Ex. 12 at 2:1-4.

[82]   *Union Planters Bank v. Connors*, 283 F.3d 896, 901 (7th Cir. 2002).  *See also In re Tauber*, 349 B.R. 540, 546 (Bankr. N.D. Ind. 2006) ("it is within the discretion of a bankruptcy court to grant a discharge even when grounds exist for the denial of a discharge"); *In re Hacker*, 90 B.R. 994, 997- 98 (Bankr. W.D. Mo. 1987) ("It is commonly said, however, that the existence of grounds for the denial of discharge, albeit a condition necessary to the

considering how to exercise this discretion, the Court must consider the purposes of the Bankruptcy Code.[83]  As the Tenth Circuit Court of Appeals recently noted:

> A central purpose of the Bankruptcy Code is to give debtors a fresh start by discharging their preexisting debts.  *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007); *see also Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).  The Code, however, does not dole out this substantial benefit indiscriminately.  Rather, the opportunity for "a completely unencumbered new beginning" is reserved only for "the honest but unfortunate debtor."  *Grogan*, 498 U.S. at 286–87 (quotations omitted); *In re Duncan*, 329 F.3d 1195, 1202 (10th Cir. 2003).[84]

The Court also notes "[a]t the core of bankruptcy law is the policy of 'obtaining a maximum and equitable distribution for creditors.'"[85]

---

actual denial of discharge, is not a sufficient condition; that it remains within the discretion of a bankruptcy court to grant a discharge even when grounds for denial of discharge are demonstrated to exist.").

In construing § 727(a), some courts, including the United States Supreme Court, have substituted language for the statutory text indicating courts cannot grant a discharge if any of the conditions under subsection (a) are met. *See*, *e.g.*, *Kontrick v. Ryan*, 540 U.S. 443, 447 n.1 (2004) ("Under § 727(a), the court *may not* grant a discharge of any debts [if any of the subsections is proved].") (emphasis added).  However, in these cases, including *Kontrick*, the courts have not decided the question of whether § 727(a) compels a denial of discharge.  *See*, *e.g.*, *Kontrick*, 540 U.S. 443 (deciding question of whether debtor forfeits right to rely on time limit for creditor to file objections to discharge when debtor does not raise issue before bankruptcy court raises merits of creditor's objection); *In re Connors*, 273 B.R. 764 (S.D. Ill. 2001) (under § 727(a)(3), the court "*shall deny* discharge" if  debtor fails to produce records, but noting that court has discretion under section 727(a) to grant discharge even if condition of § 727(a)(3) is proved).  Indeed, the Fourth Circuit Court of Appeals has characterized *Kontrick's* statement about § 727(a) as "dicta."  *Tidewater Fin. Co. v. Williams*, 498 F.3d 249, 257 n.9 (4th Cir. 2007).

Looking to the plain language of § 727(a), which states, "the court shall grant a debtor a discharge unless. . . ," the Court agrees with those authorities who have concluded § 727(a) is properly construed to "[compel] the grant of a Chapter 7 discharge if one of the paragraphs of § 727(a) does not apply," but not to "compel the denial of such discharge if one of such paragraphs does apply."  *Cellco Partnership v. Bane (In re Bane)*, 426 B.R. 152, 16 (Bankr. W.D. Penn. 2010).

[83]  *See Creative Recreational Sys., Inc. v. Rice (In re Rice)*, 109 B.R. 405, 407 (E.D. Cal. 1989) ("The determination to deny a discharge is committed to the discretion of the court, taking into account the two-fold purposes of the Bankruptcy Code to secure equitable distribution of the estate among creditors and to relieve the honest debtor from the weight of oppressive indebtedness, thereby permitting a fresh start.")

[84]  *Standiferd v. U.S. Trustee*,___ F.3d___, 2011 WL 1368773 (10th Cir. Apr. 12, 2011).

[85]  *Holcomb v. Hardeman (In re Holcomb)*, 380 B.R. 813, 816 (10th Cir. BAP 2008) (quoting *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 563,(1994) (other citations omitted).

The determination whether to deny discharge is "necessarily fact-bound and requires careful reflection by the court."[86]  Further, it requires the Court to evaluate whether "the debtors' prepetition debt is of such magnitude that denial of a discharge would make life virtually impossible for them" and to balance that against "the degree of heinousness evidenced by the circumstances of the violation of the bankruptcy laws which constitutes the ground for denial of discharge."[87]

This case presents a very close call.  Certainly, the evidence was more than sufficient to raise questions about the Debtors' good faith and honesty during their bankruptcy case.[88]  However, the Court is not convinced the Debtors had other than honest intentions, nor that they acted with reckless disregard of the truth.  Specifically, the Debtors' honesty at the 2004 Examination, and their post-petition efforts (undertaken after receiving advice from new counsel), shows they meant to comply with their obligations, but, like so many, were out of their element in trying to navigate the complex waters of the bankruptcy system.  The Court believes the Debtors' missteps were unintentional, and made based upon misunderstandings that could have been corrected had their original counsel complied with his professional obligations to confer with his clients and to ask them questions about the sale of their business and disposition of the proceeds from the sale thereof.  The Court also believes Debtors' missteps might have been averted had their original counsel provided proper bankruptcy planning advice to them and advised them not merely that they could pay their taxes, but about the logistics of making such payment.  Further, the post-petition misstep of failing to turn over the $5,000 after the 2004 Examination could have been avoided by a simple attorney-client discussion.[89]  Mr. Griego failed his clients by withdrawing after it became evident during the 2004 Examination that the Debtors had not disclosed various assets and transfers.  In sum, the Court concludes the Debtors' mistakes could have been avoided had Mr. Griego exercised reasonable diligence and provided appropriate representation.

In addition the Court believes a reasonable debtor should understand the obligation to testify honestly under oath, even without the advice of counsel.  However, the Court also believes it was reasonable for the Debtors to rely upon the advice of their counsel, and to flounder when such advice was absent.  The Court further notes when new counsel came to the

---

[86] *Rice*, 109 B.R. at 407.

[87] *Hacker*, 90 B.R. at 997-98.

[88] Because the bankruptcy system relies so heavily upon debtors' candor with officials of the estate, it is absolutely appropriate for officers of the estate to bring actions in cases where it appears a debtor may have hidden assets or attempted to "game the system."  Therefore, the Court commends the UST – and the Chapter 7 Trustee – for pursuing this matter.  It is clear this adversary proceeding was brought in an effort to protect the integrity of the bankruptcy system, which is exactly what the UST ought to do.

[89] Indeed, when Mr. DiGesualdo asked who would pay his taxes if he turned the funds over, Mr. Hepner stated, "Well, that's something you'll have to take up with Mr. Griego, to the extent that . . . taxes that are owed from . . . prior to the filing . . . ."  (Ex. 13 at 89:4-9.)

Page 22 of  23

aid of the Debtors, they took appropriate steps to turn over the funds to the Chapter 7 Trustee. Thus, in the end, the funds were available for distribution to creditors.

Here, given the magnitude of the Debtors' debts and the Debtors' ages, the denial of discharge would be an extremely severe penalty, particularly when weighed against the harm to creditors resulting from their actions.[90]  The penalty seems all the more severe when considered in light of the fact it appears Debtors' missteps occurred because they were poorly represented, and in light of the Debtors' efforts to fix their mistakes after receiving advice from new counsel.

## CONCLUSION

Therefore, in light of the foregoing, and keeping in mind § 727(a) should be construed in favor of the Debtors, the Court finds the Debtors' discharge should not be denied.   Accordingly,

IT IS ORDERED that the UST's first cause of action  pursuant to 11 U.S.C. § 727(a)(2)(A) is hereby DENIED.

IT IS FURTHER ORDERED that the UST's second cause of action pursuant to 11 U.S.C. § 727(a)(2)(B) is hereby DENIED.

IT IS FURTHER ORDERED that the UST's third cause of action pursuant to 11 U.S.C. § 727(a)(2)(A) is hereby DENIED.

IT IS  FURTHER ORDERED that the UST's fourteenth cause of action pursuant to 11 U.S.C. § 727(a)(4)(A) is hereby DENIED.

IT IS FURTHER ORDERED that the UST's sixteenth cause of action pursuant to 11 U.S.C. § 727(a)(4)(A) is hereby DENIED.

Dated June 30, 2011

BY THE COURT:

Michael E. Romero
U.S. Bankruptcy Judge

---

[90]  Because the $5,000 was turned over, its initial nondisclosure did not harm creditors.  As for the transfers to Ms. Mellick and Mr. Ledbetter, the Trustee was able to recover the bulk of the funds for distribution.  To the extent that portions of the preferential transfers were not recovered, the effect on the overall distribution to creditors is minimal.